| United States District Court | | Southern District of Texas |
|---|---|---|
| Commercial Coating Services International LLC, | § § § § | |
| Plaintiff, | § § | |
| versus | § § | Civil Action H-12-2400 |
| Field Pipe Systems SRL, | § § § | |
| Defendant. | § § | |

## Findings and Conclusions

1. *Background.*

Esso Highlands Limited, a subsidiary of ExxonMobil Corporation, operates a liquified-natural gas operation in Papua New Guinea. As part of its operation, it built pipelines across the Gulf of Papua to connect its fields to its plant in Port Moresby. It hired Saipem Comercio Maritimo – a general contractor – to build the pipelines.

Two barges, the Semac 1 and the Castoro 10, laid pipe from Exxon's gas fields to Port Moresby. The Castoro sailed in shallow water, while the Semac sailed farther offshore. Each barge had segments of concrete-coated pipe that were welded together to form the pipeline. Because the joint – where two segments of pipe were welded together – was bare steel, it had to be coated and insulated. Exxon required that the joint be coated with epoxy and then covered with polyurethane foam.

Coating the pipe joints requires several steps. After segments of pipe were welded together, the welds were cleaned and sandblasted – using metallic particles, not sand. Then the contractor heated the pipe and applied the epoxy. After the epoxy cured, a contractor applied a polyurethane foam so that the diameter of the pipe at the joint was equal to the diameter of the pipe coated with concrete.

These steps were to be performed in discrete areas or "stations" on each barge. The Castoro was a single joint barge, meaning that each step was performed on one pipe joint at a time. The Semac was a double joint barge – each step was being performed on two

simultaneously. Every eight minutes, each barge would sail the length of one segment of pipe for the Castoro or two segments of pipe for the Semac.

Field Pipe Systems SRL is an Italian contractor that works on pipelines. It contracted with Saipem to coat and insulate the pipe joints. Field in turn contracted with another company, Commercial Coating Services International, LLC, to coat the joints.

2.   *Bid.*

To get the contract from Saipem, Field had to bid on it. Before submitting its bid, Field negotiated with Commercial. From March through September 2010, Commercial and Field exchanged proposals and other papers that culminated in September.

On September 2, 2010, Commercial gave Field a bid for some of the work on the pipe joints. The bid said that Commercial would supply equipment, materials, and supervision for sandblasting, heating the pipe, and applying the epoxy on both barges. To accomplish these tasks within eight minutes, Commercial said it needed three stations on the Castoro and six stations on the Semac. The Castoro's three stations would be for sandblasting, applying the epoxy, and applying the polyurethane foam. The Semac's six stations would be two for each task – the same arrangement as on the Castoro but doubled.

On September 15, 2010, Field negotiated a 2.5% price reduction from Commercial's September 2, 2010, bid. There was no other change. Field then gave its bid to Saipem. Field's bid said that it would prepare and coat the pipe joints using three stations on the Castoro, and four on the Semac. It said that it could complete each task within eight minutes on both barges. Commercial did not know the details of Field's bid to Saipem.

On September 16, 2010, Commercial sent Field a revised bid to reflect the 2.5% reduction. The other terms were the same as the September 2, 2010, bid.

3.   *Contract.*

On September 27, 2010, Field and Commercial agreed that if Field were awarded the contract, it would work exclusively with Commercial toward another agreement based on the September 16, 2010, bid.

On October 7, 2010, Saipem awarded Field the contract. Later that month, before a meeting of the contractors with ExxonMobil, Commercial discovered that Field intended to use four stations. Commercial told Field that it could not perform the sandblasting and epoxy

coating on the Semac with only four stations. Field told Commercial not to discuss the problem with Saipem or ExxonMobil – that they would solve it themselves.

To solve the problem, Commercial and Field agreed that Field would sandblast. Commercial would still heat the pipe and apply the epoxy. Commercial gave Field bids for the revised scope of work on November 4, 2010, and December 7, 2010. Field accepted the December seventh bid and issued a purchase order on January 6, 2011, that reflected it.

After Field took the blasting, Commercial and it tested the four-stall arrangement to verify that it could be done in fewer than eight minutes. The new division passed the test, and both companies prepared to work.

On December 1, 2011, Field issued a new purchase order that allowed it to retain 10% of the contract price until the end of the job, and that promised to pay Commercial 90% of its invoices within sixteen days of submission. It otherwise reflected the December 7, 2010, proposal.

Despite some delays, minor worker injuries, and the necessity of more material, both barges completed laying the pipelines by June 2012. By January, Field had stopped paying Commercial's invoices. In July 2012, Commercial sued Field for the balance. Field sued that Commercial reneged on its original bid.

4.  *Promissory Estoppel.*

Field says that it relied on Commercial's bids of September 2 and 16, 2010, and the agreement of September 27, 2010. To prevail, Field must show a promise on which it reasonably, substantially, and foreseeably relied.[1]

It submitted its bid to Saipem on September 15. Axiomatically, it could not have relied on proposals or agreements after this date. Commercial's only offer that had not been rejected was the September second bid. It specified that Commercial would sandblast, heat, and coat the pipe joints in six stations on the Semac. Field's bid proposed using four stations without telling Commercial.

Field says that its bid was not materially different because Commercial bid (a) four full sets of equipment for the Semac– two sets for sandblasting, two for applying the epoxy, and a two backup pairs – and (b) a six-minute-cycle time to apply the epoxy. It says that a four-station

---

[1] English v. Fisher, 660 S.W.2d 521, 524 (Tex. 1983).

configuration was compatible with these specifications because Commercial's equipment could fit in four stalls and the polyurethane foam could be applied in the two minutes after the epoxy.

Field is wrong. Commercial's bid says that its six-minute-cycle time is based on six stations. While it may be possible to cram everything into four stations, this would affect the time it would take to apply the epoxy. More people and equipment in the same amount of space breeds delay. It is also unremarkable that Commercial proposed four full sets of equipment. Its bid included equipment for the tasks it proposed to complete – sandblasting and applying the epoxy. Concluding that the number of stations is linked to the quantity of equipment is little more than *cum hoc ergo propter hoc*.

Commercial's bid was based on its business judgment. Field was not free to disregard its terms or rework its details. Because it proposed four stations, Field's bid to Saipem was materially, adversely different from Commercial's proposal. Field did not reasonably rely on Commercial's bid.

Assuming Field relied on the September sixteenth proposal in it bidding the day before, the bid's terms were the same as on September second. It proposed six stations on the Semac, not the four that Field bid.

Field says that it told Commercial that it intended to use four stations. That is not what its bid proposes. Assuming the court were to consider extrinsic evidence, Field's requests for information ask that Commercial tell it whether four stations are possible – not that it must bid four stations or that Field would bid four stations.

Field says that if it had not relied on the bids and agreement in its bidding to Saipem, it relied on them in entering its contract with Saipem, after it was awarded the project.

The operative time for Field to rely on Commercial's proposals is when it bid to Saipem. After Saipem accepted Field's bid, Field was obliged to perform.

Assuming Field was not obliged when Saipem accepted the bid, Field could not have reasonably relied on the September sixteenth proposal or the September 27 agreement. In both, Commercial agreed that it would sandblast, heat the pipe, and apply the epoxy with six stations. Though the September 27 agreement incorporates e-mails and other communications about using four stations, none say that Field would use four. At most, they ask if a four stall arrangement is possible. They do not alter the express language of Commercial's bid.

5.  *Duress.*

Field says that the January 6 and December 1, 2011, purchase orders are unenforceable because they were issued under duress. It says that Commercial reneged on its bid and Field had to agree to the new terms lest it breach its contract with Saipem.

Commercial did not renege on its bid. Commercial was willing and able to perform the sandblasting, heating, and coating with six stations. It did not propose and was not obliged to perform with four stations. Its refusal to do so was not illegal or fraudulent.[2]

When Field issued the purchase order, there was no indication that it was coerced or forced to do so. Field discussed other projects with Commercial and was happy with their work. They looked forward to working together in the future – a peculiar view for someone being held over a barrel.

Field was constrained by its own choices. It chose to bid four stations, despite Commercial having bid six. After it won the contract, it chose to negotiate with Commercial. ExxonMobil approved two other companies to coat the pipeline. Field could have negotiated with either one to do the work. It chose not to. Its "duress" was of its own making.

6.  *Money Had and Received.*

Field says that it paid Commercial even though it did not perform as promised in the September sixteenth bid. It says that Commercial should return some of its money.

Commercial was not obliged to perform under its September proposals because Field bid the job differently. After Saipem awarded Field the contract, Commercial agreed to apply the epoxy but not sandblast. Commercial performed its obligations but was not fully paid. Commercial does not have money that belongs to Field.

7.  *Payment.*

The December 1, 2011, purchase order says that Commercial will send invoices to Field periodically for the work it performed. Field agreed to pay Commercial 90% of each invoice within fifteen days. The remaining 10% would be retained by Field until the end of the project.

Field partially paid some invoices, was late in paying others, and eventually stopped paying altogether. The balance owed is $1,646,485.05.

---

[2] Ward v. Scarborough et al., 236 S.W. 434, 437 (Tex. 1922).

8.   *Offset.*

Field says that it may deduct amounts it incurred as a result of Commercial's delays, equipment breakdowns, and material shortages. Field claims a deduction of $507,568.97.

Field's papers do not support its claim. Field has eight invoices that total nearly one-half million dollars. All but one was prepared in June of 2012. A cursory look at the supporting papers to each invoice reveals a dearth of support. There are no purchase orders, little to no connection between the materials claimed and the e-mails describing the necessity, and no prices. The shipping manifests and air-freight bills are also untethered to the material that was shipped.

Field is not entitled to charge Commercial for additional material that it needed. Commercial provided enough material to reasonably coat each joint of the pipeline. Additional material, needed because of spills, over spray, or waste is Field's responsibility. Commercial did not agree to supply all of the material Field may need to coat the pipe joints.

The court suspects that Field has attempted to evade Commercial's claims with a paper dodge. Field is not entitled to an offset because it has not proven that it incurred expenses because of Commercial's delay.

9.   *Conclusion.*

Field bid the job differently than its subcontractor. After Saipem accepted Field's bid, Field had to find a solution. Commercial agreed to do a portion of the work, despite the change. Field must pay Commercial for its work.

Commercial Coating Services International, LLC, will take $1,646,485.05 from Field Pipe Systems, SRL.

Signed on June 19, 2015, at Houston, Texas.

_____
Lynn N. Hughes
United States District Judge